IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-01162-LTB-CBS

PLAZA INSURANCE COMPANY, a Missouri corporation,

      Plaintiff,

v.

CAROLYN LESTER,
JAMES BRADEN, and
BONNIE BRADEN,

      Defendants.

---

## ORDER REGARDING DEFENDANTS' MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS

---

Magistrate Judge Shaffer

      This matter comes before the court on Defendants Carolyn Lester, James Braden, and Bonnie Braden's (collectively the "Defendants") Motion to Compel the Production of Documents (doc. #27), filed on September 15, 2014.  As of that date, Plaintiff Plaza Insurance Company (hereinafter "Plaza" or the "Plaintiff") had produced approximately 530 pages from its claim file and withheld 143 pages and additional redactions based upon the attorney-client privilege and/or the work product doctrine.  The motion to compel was referred to this magistrate judge by memorandum (doc. #28) on September 16, 2014.  Plaintiff  filed its Response in Opposition to Defendants' Motion to Compel (doc. #29) on October 9, 2014, which was followed by Defendants' Reply (doc. #36) on October 16, 2014.

      I held a hearing on the pending motion on October 20, 2014.  At that time, I directed

1

Plaza's counsel to submit an updated privilege log and copies of those documents that Plaintiff was withholding on the basis of privilege for the court's *in camera* review.  The court held another hearing on February 17, 2015.  At the conclusion of that hearing, the parties were directed to submit supplemental briefs addressing the issue of whether or to what extent an uninsured motorist (UIM) claim might be barred by the "one civil action" rule set forth in Colorado's Wrongful Death Act, C.R.S. §13-21-203(1)(a).[1]  Defendants and Plaza filed supplemental briefs on February 24, 2015 (doc. ## 53 and 54, respectively).[2]

The court has completed its *in camera* review of the materials submitted by Plaza.  I also have carefully viewed the parties' briefs and exhibits, the entire case file, and the applicable case law.  For the following reasons, I will grant Defendants' motion and require production of some documents previously withheld by Plaza.

## PROCEDURAL BACKGROUND

Plaza Insurance Company commenced this case on April 24, 2014 by filing a Complaint for Declaratory Relief (doc. #1).  That Complaint acknowledged that on August 24, 2013, while working in the course and scope of his employment as a tow truck driver for C&J Auto Service

---

[1] The Act provides, in relevant part, that "[t]here shall be only one civil action . . . for recovery of damages for the wrongful death of any one decedent."

[2] During this same period, Plaza filed a Motion for Summary Judgment (doc. #40), and Defendants filed their Motion for Partial Summary Judgment (doc. #41).  As framed by Plaintiff's motion, the threshold issue in this action is "[w]hether [C.R.S.] §13-21-203(1)(a) . . . bars Defendants from bringing a second action claiming UIM benefits after the dismissal with prejudice of . . . a wrongful death action already commenced and dismissed by Defendants James Braden and Bonnie Braden."  Defendants' cross-motion for partial summary judgment argued in response that "Plaza's theory is buttressed neither by the language of the Wrongful Death Statute nor Colorado case law and would produce absurd results not intended by the legislature."  The district court decided these summary judgment motions on May 13, 2015 with a Memorandum Opinion and Order (doc. #57) which held, in pertinent part, that Defendants' claims for breach of the UIM insurance policy at issue in this case are not barred by §13-21-203(1)(a) of the Colorado Wrongful Death Act.  While the district court granted summary judgment in favor of Defendants on Plaza's claim seeking a declaratory judgment, it declined to decide the applicability of the "one civil action" rule to Defendants' claims based on Plaza's alleged bad faith breach of the UIM policy.

("C&J"), Martin Braden was fatally struck by a vehicle operated by Dana Beales.  Plaza's Complaint also noted that James Braden and Bonnie Braden, as parents of Martin Braden, filed a wrongful death action in the District Court for the County of Weld, Colorado on September 20, 2013 based upon the death of their son.  In their complaint, the Bradens stated that their son was unmarried at the time of his death.  Unbeknownst to the Bradens, Carolyn Lester considered herself Martin Braden's common law wife.[3]  Plaza's Complaint for Declaratory Relief states that "Carolyn Lester, James Braden, and Bonnie Braden participated in mediation on December 10, 2013 to reach an agreement, as between them, regarding how any judgment or settlement proceeds from any wrongful death action would be shared."  Ms. Lester and the Bradens also were aware that Martin Braden had been covered under C&J's insurance policy at the time of his death.  Plaza does not dispute the existence of that coverage.  The Bradens' counsel made a demand on Plaza for UIM coverage, up to the policy limits of $1,000,000.00, on February 26, 2014.

Plaza alleges, and it is not disputed, that the Bradens settled their wrongful death action against Mr. Beales for $100,000.00, the limits of his insurance policy.  Thereafter, the wrongful death action in Weld County District Court was dismissed on April 10, 2014, without Ms. Lester ever intervening or formally joining that litigation as a named party.  Plaza commenced this declaratory judgment action two weeks later, on April 24, 2014.

Defendants filed their Answer and Counterclaim (doc. #9) on June 6, 2014.  Defendants

---

[3]Ms. Lester's status was relevant to the application of Colorado's Wrongful Death Act, which provides that where the death of a person is caused by the wrongful act or neglect of another, an action may be brought in the first year after such death "by the spouse of the deceased" or "[i]f there is no spouse, by the heir or heirs of the deceased."  *See* C.R.S. § 13-21-201(1)(a).  In the second year after the victim's death, the wrongful death action can be brought by the spouse, by the heirs of the deceased or "by the spouse and the heir or heirs of the deceased."  *See* C.R.S. § 13-21-201(1)(b).

collectively asserted claims for breach of contract for insurance benefits (first claim), bad faith breach of an insurance contract (second claim), unreasonable delay and/or denial in violation of C.R.S. §§ 10-3-1115 and 10-3-1116 (third claim), and fraud (fourth claim). The fraud claim specifically alleged that Plaza and its attorneys "fraudulently induced Defendants into believing that their request for UIM benefits would be honored and paid" in the wake of their mediated settlement of the wrongful death claims, that Defendants settled those claims "acting . . . in detrimental reliance upon Plaza's misrepresentations and false statements," and that Plaza "intended to fraudulently induce Defendants to take steps that Plaza could later attempt to use to its benefit in refusing to pay the UIM benefits to which Defendants have been and are entitled."

The exhibits attached to Defendants' Answer and Counterclaim expand upon the facts set out in Plaza's Complaint. Those exhibits include a letter from Plaza's outside law firm, Treece Alfrey Musat P.C. (the "Treece Firm"), dated March 7, 2014, to John Astuno, Jr., the attorney representing the Bradens and Ms. Lester, stating "[p]ursuant to your request of February 20, 2014, this letter will confirm that . . . Plaza Insurance Company, through its third party claims administrator, North American Risk Services [NARS], consent to your proposed settlement with . . . the insurance carrier for Dana Rex Beales." *See* Exhibit 1 (doc. #9-1) attached to Defendants' Answer and Counterclaim. On March 18, 2014, before the wrongful death action in Weld County District Court was dismissed, Mr. Astuno advised Katherine Jensen, an attorney at the Treece Firm, that Ms. Lester would be asserting a claim under the UIM policy as "[s]he is the common law wife of the deceased" and that the Bradens would sign a release "assuming we can conclude this matter." *See* Exhibit 2 (doc. #9-2) attached to Defendants' Answer and Counterclaim. On April 1, 2014, Mr. Astuno again wrote to Ms. Jensen, forwarding a copy of

the proposed Settlement Agreement with Mr. Beales' insurance carrier and asking her to "give us the benefit of your thoughts on the matter."  Mr. Astuno explicitly asked for Plaza's "blessing" of the proposed Settlement Agreement.  *See* Exhibit 4 (doc. #9-4) attached to Defendants' Answer and Counterclaim.  On April 11, 2014, Mr. Astuno wrote to Ms. Jensen expressing his belief that "you have been provided with everything you need to evaluate this claim" and hinting at some frustration that "[w]e have jumped through numerous hoops and have yet to receive from you an offer in response to our policy limit demand."  *See* Exhibit 6 (doc. #9-6) attached to Defendants' Answer and Counterclaim.

This court held a Fed. R. Civ. P. 16 scheduling conference on August 21, 2014.  During that conference, counsel for Defendants and Plaza's new counsel from the firm of Sweetbaum Sands Anderson, P.C. discussed anticipated disputes involving Plaintiff's assertion of the attorney-client privilege and the work product doctrine in the context of Plaza's initial disclosures under Fed. R. Civ. P. 26(a)(1).  I advised defense counsel that Rule 26(a)(1)(A)(ii) only requires a party to identify those documents in its possession, custody or control that it "may use to support its claims or defenses, unless the use would be solely for impeachment" and, more importantly, did not require the disclosing party to physically produce any documents as part of their initial disclosures.  *Cf. Kern River Gas Transmission Co. v. 6.17 Acres of Land*, 156 Fed. Appx. 96, 101 (10th Cir. 2005); *Kleiner v. Burns*, No. 00-2160-JWL, 2000 WL 1909470, at *4 n.5 (D. Kan. Dec. 22, 2000).  The court expressed the view that any privilege disputes were better framed in the context of actual requests for production under Fed. R. Civ. P. 34.  *See* Fed. R. Civ. P. 37(a)(3)(A) (permitting a party to move to compel "if a party fails to make a disclosure *required* by Rule 26(a)") (emphasis added).  I directed Defendants to serve requests

for production by August 25, 2014, and then contact Plaza's counsel by September 5, 2014 to determine if Plaintiff would continue to withhold materials as privileged or protected under Fed. R. Civ. P. 26(b)(3).  Defendants filed their motion to compel on September 15, 2014.

In moving to compel, Defendants raise alternative arguments.  First, Ms. Lester and the Bradens contend that all communications between Plaza, NARS and the Treece Firm are not shielded by the attorney-client privilege because, for much of the relevant time period, outside counsel were working in an extra-legal or investigative capacity and acting more as claims adjuster than legal advisors.  *See* Defendants' Motion to Compel, at 11.  Second, Defendants maintain that work product protection cannot extend to most of the withheld documents because "there is no evidence to suggest that between September 26, 2013 and April 24, 2014, Plaza had reason to believe there was a substantial probability that Carolyn Lester or James or Bonnie Braden would file imminent litigation against it on the UIM claim."  *Id.* at 13.  Even if the contested documents fall within the work product doctrine, Ms. Lester and the Bradens insist that the Treece Firm's materials are critical to the preparation of their claims and substantially equivalent information cannot be obtained through other means.  *See* Fed. R. Civ. P. 26(b)(3). Finally, Defendants argue that the crime fraud exception allows for disclosure of otherwise-privileged documents "[t]o the extent Defendants can make a 'prima facie showing that the[ir] allegations of attorney participation in [Plaza's] . . . fraud has some foundation in fact."  *Id.* at 14.   Plaintiff's brief in opposition insists that "[w]ith the exception of documents showing direct communication with its attorneys or internal communication discussing specific conversations with its attorneys, Plaza has produced the entire claim file in this action."  *See* Response in Opposition, at 4.  Plaintiff contends that the Treece Firm was retained not to

conduct a factual investigation, but rather to provide legal advise and opinion regarding the UIM

claim. As for the applicability of the crime-fraud exception, Plaintiff insists that

> Not one document referenced by Defendants tends to show that Plaza sought the
> advise of the Treece Firm . . . to commit a crime or fraud, let alone attempt to
> deprive anyone of the benefit of UIM benefits under the Policy. In fact, all
> correspondence referred to by Defendants tends to show that Plaza was working
> with Defendants up until it received notice that Defendants failed to properly
> handle the underlying action pursuant to Colorado's Wrongful Death Act and
> Colo. Rev. Stat. § 13-21-203. Until Plaza received a copy of the Notice of
> Dismissal of the action, it was under the mistaken belief that Lester would be
> substituting into the Wrongful Death Action and pursuing the underlying claim in
> that lawsuit.

*See* Plaintiff's Response in Opposition, at 15.

## ANALYSIS

Rule 26(b)(1) of the Federal Rules of Civil Procedure requires production of

nonprivileged materials relevant to a party's claims or defenses. Privileges further the

administration of justice and "should not be set aside lightly." *See Horton v. United States*, 204

F.R.D. 670, 672 (D. Colo. 2002). However, privileges also serve to withhold relevant

information from the finder of fact and for that reason should be narrowly construed. *See*

*Montgomery v. Leftwich, Moore & Douglas,* 161 F.R.D. 224, 225 (D.D.C. 1995). Where, as in

this case, subject matter jurisdiction is premised on diversity, the court must apply Colorado's

law governing attorney-client privilege. *White v. Am. Airlines, Inc.*, 915 F.2d 1414, 1424 (10th

Cir. 1990) ("In a civil action based upon a state cause of action, state law controls the

determination of privileges."). "Unlike the attorney client privilege, the work product privilege

is governed, even in diversity cases, by a uniform federal standard embodied in Fed. R. Civ. P.

26(b)(3)." *Frontier Refining, Inc. v. Gorman-Rupp Co., Inc*., 136 F.3d 695, 702 n.10 (10th Cir.

1998) ) (quoting *United Coal Cos. v. Powell Constr. Co.*, 839 F.2d 958, 966 (3rd Cir. 1988)).

7

A.      *The Attorney-Client Privilege and Work Product Doctrine*

The attorney-client privilege extends only to confidential matters communicated between the attorney and his or her client in the course of receiving counsel, advice, or direction with respect to the client's rights or obligations.  *See, e.g., A. v. Dist. Court of Second Judicial Dist.*, 550 P.2d 315, 327 (Colo. 1976), *cert denied*, 429 U.S. 1040 (1977); *Losavio v. District Court*, 533 P.2d 32, 35 (Colo. 1975).  Under the common law, "a critical component of the privilege 'is whether the communication between the client and the attorney is made in confidence of the relationship and under circumstances from which it may reasonably be assumed that the communication will remain in confidence.'"  *In re Qwest Commc'ns Int'l, Inc.*, 450 F.3d 1179, 1185 (10th Cir. 2006) (quoting *United States v. Lopez*, 777 F.2d 543, 552 (10th Cir. 1985)).

The work product doctrine exempts from discovery "documents and tangible things . . . prepared in anticipation of litigation or for trial," *see* Fed. R. Civ. P. 26(b)(3)(A), and is intended to provide a lawyer "with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Hickman v. Taylor*, 329 U.S. 495, 510 (1947).  In that respect, the work product doctrine is not a privilege within the scope of Fed. R. Evid. 501, but rather "a tool of judicial administration" that furthers the goals of fairness and convenience. *Pete Rinaldi's Fast Foods, Inc. v. Great Am. Ins. Cos.*, 123 F.R.D. 198, 201 (M.D.N.C. 1988).  The doctrine does not protect materials prepared in the "ordinary course of business." *W. Nat'l Bank v. Emp'rs Ins. of Wausau*, 109 F.R.D. 55, 57 (D. Colo. 1985).  "A document is protected by the work product privilege if it was prepared in anticipation of litigation by another party or that party's representative, and was intended to remain confidential." *Aull v. Cavalcade Pension Plan*, 185 F.R.D. 618, 624 (D. Colo. 1998).

8

> Documents prepared in anticipation of litigation are those that, "in light of the nature of the document and the factual situation in the particular case . . . can fairly be said to have been prepared or obtained because of the prospect of litigation." Thus, documents that were prepared in the ordinary course of business or that "would have been created in essentially similar form irrespective of the litigation" are not protected by the work product doctrine.

*Weber v. Paduano*, No. 02 Civ. 3392(GEL), 2003 WL 161340, at *3 (S.D.N.Y. Jan. 22, 2003) (internal citations omitted). *Cf. Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 622 (7th Cir. 2009) ("Work product protection applies to attorney-led investigations when the documents at issue 'can fairly be said to have been prepared or obtained because of the prospect of litigation.'") (quoting *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 976-77 (7th Cir. 1996)).

The party asserting the attorney-client privilege and/or work product protection bears the burden of persuasion, and cannot sustain that burden simply by asserting that withheld materials contain privileged or protected information. *See FDIC v. United Pac. Ins. Co.*, 152 F.3d 1266, 1276 n.6 (10th Cir. 1998). Rather, the party must make a "clear showing" and provide "precise reasons" for withholding each otherwise relevant document. *See Black & Veatch Corp. v. Aspen Ins. (UK) Ltd.*, 297 F.R.D. 611, 615 (D. Kan. 2014) (the party withholding documents must "provide sufficient information to enable the court to determine whether each element" of the privilege or work product doctrine is satisfied). *See also Testwuide v. United States*, No. 01-201L, 2006 WL 5625760, at *4 (Fed. Cl. Aug. 7, 2006) ("Document descriptions in a privilege log must contain more than boilerplate assertions that the documents in question contain attorney-client communications;" "the description of each document and its contents must be sufficiently detailed to allow the court to determine whether the elements of attorney-client privilege . . . have been established."); *Illiana Surgery and Med. Ctr. LLC v. Hartford Fire Ins.*

9

*Co.*, No. 2:07 cv 3, 2008 WL 2622803, at *3 (N.D. Ind. Jun. 30, 2008) (finding that defendant

had not met its burden of showing why each document withheld on the basis of privilege was

entitled to protection; "[i]nstead, the privilege log contain[ed] virtually the same boilerplate

language with respect to each assertion of the privilege").[4]

I find that most, but not all of the documents submitted for my *in camera* review fall

within the attorney-client privilege.[5]  The court is satisfied that the Treece Firm provided "legal

advice and opinion as to the UIM claim made in conjunction with Mr. Braden's death and

concerning its exposure and legal obligations pursuant to Colorado law regarding the Policy."

*See* Exhibit 2 (doc. #29-1) attached to Plaintiff's Response in Opposition.  However, it is also

---

[4]Plaza's Revised Privilege Log and First Supplemental Privilege Log suffers from this infirmity.  For many of the withheld documents, Plaza simply states  "Attorney/Client Privilege and Work Product Protection: communications between North American Risk Services/Plaza representatives and legal counsel for North American Risk Services/Plaza."  That description, and many others on the privilege logs, are of little or no value to the court.  *See Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 265 (D. Md. 2008) (noting that "[i]n actuality, lawyers infrequently provide all the basic information called for in a privilege log, and if they do, it is usually so cryptic that the log falls far short of its intended goal of providing sufficient information to the reviewing court to enable a determination to be made regarding the appropriateness of the privilege/protection asserted without resorting to extrinsic evidence or *in camera* review of the documents themselves").

[5]Many of the documents submitted for the court's *in camera* examination are duplicates, are patently irrelevant, or communications between Plaza and its counsel that occurred well after the instant lawsuit was filed.  This may be attributed, in part, to discovery requests that were over-inclusive or not tailored to the actual needs of the case.  While *in camera* review may be warranted in some cases, it is a time-consuming exercise that diverts the court from other equally pressing matters.  *See, e.g., Victor Stanley, Inc.*, 250 F.R.D. at 265-66 ("The time it takes the court to review . . . extrinsic evidence on a document-by-document basis can be extensive, particularly given the tendency of lawyers to be over-inclusive in the assertion of privilege/protection in the first place.").  Before asking the court to conduct an *in camera* review, parties and their counsel should take all reasonable steps to insure that the court's time is used efficiently by narrowing the *in camera* review to those documents that are truly at issue.  Counsel can, in the first instance, achieve that goal by agreeing to procedures that will generate a privilege log that meets the requirements of  Fed. R. Civ. P. 26(b)(5)(A), but is also reasonable and proportionate to the needs of the case.  *See* Fed. R. Civ. P. 26(f)(3)(E) (the parties should submit a discovery plan that addresses "what changes should be made in the limitations on discovery imposed under these rules") and  Fed. R. Civ. P. 29(b) (permitting the parties to stipulate to the modification of procedures governing or limiting discovery).  *See also* John M. Facciola and Jonathan M. Redgrave, *Asserting and Challenging Privilege Claims in Modern Litigation: The Facciola-Redgrave Framework*, 4 Fed. Cts. L. Rev. 19 (2010) (suggesting, for example, that parties can agree that a privilege log will not include exact duplicates, or correspondence between the client and litigation counsel sent after the pending lawsuit commenced).  In the future, this court will expect counsel to take reasonable steps to ensure an efficient and focused use of the *in camera* review mechanism.

clear that the Treece Firm's initial efforts were often investigative and non-legal in nature.[6] Some of the documents included on Plaza's privilege log simply direct the Treece Firm to collect police files or court records.[7]  *See Fiechtner v. Am. Family Mut. Ins. Co.*, No. 09-cv-02681-WJM-MEH, 2011 WL 4087296, at *2 (D. Colo. Sept. 13, 2011) (holding that where counsel for the insurance company was acting as a claims adjuster, rather than an attorney, his actions in that capacity were not protected by the attorney-client privilege or work product doctrine).  *Cf. Colorado Mills, LLC v. Phila. Indem. Ins. Co.*, No. 12-cv-01830-CMA-MEH, 2013 WL 1340649, at *4 (D. Colo. Apr. 2, 2013) ("the mere retention of an attorney to investigate a claim does not automatically render privileged all communications concerning the investigation"); *Kannaday v. Ball*, 292 F.R.D. 640, 647 (D. Kan. 2013) (noting that "not every communication between an attorney and client is privileged; only confidential communications made the for purpose of seeking or giving legal advice are protected").

The attorney-client privilege protects the substance of a communication between counsel and client; it does not apply to the *fact* that such communications took place.  *See Kemp v. Hudgins*, No. 12-2739-JAR-KGG, 2015 WL 866905, at *2 (D. Kan. Mar. 2, 2015).  Yet, Plaintiff's privilege logs include multiple communications between Plaza, NARS and the Treece Firm that are devoid of any legal content.  Often these "privileged" communications merely reflect the scheduling of a telephone call or conference, with no hint of the topic(s) to be

---

[6]It appears that NARS and Plaza looked to the firm of Robinett Murphy & Shrier to analyze coverage issues. Defendants concede that the attorney-client privilege extends to communications between Plaza and NARS and the Robinett Firm and those communications are not the subject of the instant motion.  *See* Reply in Support of Defendants' Motion to Compel, at 1.

[7]*See, e.g.,* Plaintiff's Revised Privilege Log and First Supplemental Privilege Log, at PICO0379 and TAM1160-1164.

discussed and no legal advice requested or given.[8]   *See In re Universal Serv. Fund Tele. Billing Practices Litig.*, 232 F.R.D. 669, 675 (D. Kan. 2005) (the attorney-client privilege does not extent to communications that simply reflect the scheduling of a meeting, the persons arranging the meeting, or the location of the meeting; the mere fact that one of the participants was an attorney does not render everything privileged).   *Cf. Stopka v. Am. Family Mut. Ins. Co.*, 816 F. Supp. 2d 516, 532 (N.D. Ill. 2011) (holding that emails that addressed mundane issues and did not solicit or provide legal advice were not privileged); *Gucci, Am. Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 79 n.12 (S.D.N.Y. 2010) (e-mails scheduling conference calls are not privileged if they simply reveal the fact that a conference took place and do not convey any underlying legal advice); *Lockheed Martin Corp. v. L-3 Commc'ns Corp.*, 2007 WL 2209250, at *5 (M.D. Fla. July 29, 2007) (written communications that were merely transmittal or scheduling documents were not within the attorney-client privilege).   Plaza and its counsel will be required to prepare, within two weeks of this Order, a new privilege log that conforms to the foregoing analysis.

Plaza's invocation of the work product doctrine is more problematic.   As previously noted, "[t]he [work product] doctrine is not intended to protect work prepared in the ordinary course of business or investigative work unless it was done so . . . in preparation for the real and imminent threat of litigation or trial."   *Kannaday*, 292 F.R.D. at 648 (internal quotation marks omitted).   *Cf. Century Surety Co. v. Smith*, No. 14-cv-00947-RM-MJW, 2014 WL 7666061, at *6 (D. Colo. Jan. 21, 2014) (noting that "[i]n Colorado, an insurance company's factual investigation of a claim is presumed to be made in the ordinary course of business rather than in

---

[8]*See, e.g.*, Plaintiff's Revised Privilege Log and First Supplemental Privilege Log, at PIC0373 [e-mail dated 3/7/14], PIC0375, PIC0402 [e-mail dated 4/24/14], PIC0426, PIC0447, TAM600, TAM606, TAM612, TAM 679, TAM683, TAM709, and TAM723.

anticipation of litigation") (citing *Hawkins v. District Court*, 638 P.2d 1372, 1378-79 (Colo. 1982)).

Here, the documents submitted for my *in camera* review make clear that Plaza, NARS and outside counsel were not anticipating litigation as of November 2013, given that the Treece Firm submitted a "budget [that] does not consider costs if [the] case were to go into suit." *See* Plaintiff's Revised Privilege Log and First Supplemental Privilege Log, at doc. PICO44. *See also* Plaintiff's Revised Privilege Log and First Supplemental Privilege Log, at docs. TAM914 ("Please note that the budget includes only the time we have spent or will spend in the fact investigation and case analysis stage, as we are not in suit.") and TAM930 (forwarding a litigation budget that "only includes analysis/investigation and time spent attending the criminal trial, since I'm not sure we will be otherwise involved"). Plaza claims work product protection for communications in September, October and November 2013 that do not even hint at the possibility of future litigation.[9] *Cf. Hurtado v. Passmore & Sons, L.L.C.*, No. 10-cv-00625-MSK-KLM, 2011 WL 2533698, at *2 (D. Colo. Jun. 27, 2011) ("Investigations of first party insurance claims, e.g., claims made by the insured to his or her insurer, typically 'do not involve liability investigations . . . . When an insured presents a first party claim, he is asking for payment under the terms of the insurance contract between him and insurance company . . . . There is no initial contemplation of litigation.") (quoting *Weitzman v. Blazing Pedals, Inc.*, 151 F.R.D. 125 (D. Colo. 1993)).

To the extent that Plaintiff is broadly asserting work product protection for documents or communications generated after September 20, 2013, it has not sustained its burden of

---

[9]*See, e.g.,* Plaintiff's Revised Privilege Log and First Supplemental Privilege Log, at PIC0013, PIC0381, PICO382-0383, PICO0443-0444, and TAM0897.

persuasion. *See Black & Veatch Corp.*, 297 F.R.D. at 619 (holding that to successfully invoke

the work product doctrine, it is not enough to show simply that a particular document was

prepared after counsel was retained). *See also Burton v. R.J. Reynolds Tobacco Co.*, 177 F.R.D.

491, 498 (D. Kan. 1997) ("Even if there is a general prospect of litigation, a document is not

protected by work product immunity if the document was prepared merely in the regular course

of business."). Even under the most expansive application of the work-product doctrine, I find

that Plaza has not come forward with facts that would suggest litigation arising from Martin

Braden's UIM coverage was reasonable foreseeable prior to March 2014. The next iteration of

Plaza's privilege log should reflect that finding.

B.      *The Crime-Fraud Exception*

The attorney-client privilege and the protections afforded by Rule 26(b)(3) are vitiated by

the crime-fraud exception when the communications between a client and attorney and the

efforts of the attorney are for the purpose of furthering a crime or a fraud.[10] *Ryskamp v. Looney*,

No. 10-cv-00842-WJM-KLM, 2011 WL 3861437, at *9 (D. Colo. Sept. 1, 2011) (citing *A. v.

Dist. Court of Second Judicial Dist.*, 550 P.2d at 324). *Cf. In re Grand Jury Subpoenas v. United

States*, 144 F.3d 653, 660 (10th Cir. 1998) (citing *In re Grand Jury Proceedings (Vargas)*, 723

F.2d 1461, 1467 (10th Cir. 1983)) (recognizing that the exception applies to both the

attorney-client privilege and the work product doctrine). *See also People v. Tucker*, 232 P.3d

194, 199 (Colo. App. 2009) ("it is now well-settled that [this exception to the attorney-client

privilege created for illegal activity] is also applicable to advice or aid secured in the perpetration

---

[10]Given the allegations in Defendants' motion to compel, the court will limit its discussion to allegations of "fraud" or "fraudulent conduct." It would be unfair to imply or insinuate that Plaza, NARS, or any attorney involved in this case would condone or support criminal conduct.

of a fraud").

A *pro forma* or frivolous invocation of the fraud exception will not justify a "groundless fishing expedition" in which the court acts as an "unwitting (and perhaps unwilling) agent[]." *United States v. Zolin*, 491 U.S. 554, 571 (1989). *Cf. AKH Company, Inc. v. Universal Underwriters Insurance Co.*, No. 13-3003-JAR-KGG, 2014 WL 2991130, at*9 (D. Kan. Jul. 3, 2014) (noting that the party asserting the exception "cannot meet its burden with 'beliefs' and conclusory statements"). Similarly, an unsubstantiated assertion of the fraud exception should not obligate the court to review *in camera* potentially voluminous records. *Cf. Zolin*, 491 U.S. at 571. For these reasons, the court must approach the issue in a measured and thoughtful manner. "Before engaging in *in camera* review to determine the applicability of the . . . exception, 'the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person,' that *in camera* review of the materials may reveal evidence to establish" that it actually applies. *Id.* at 572 (internal citation omitted).

> Procedurally, a district court should apply a two-step process in determining whether the . . . exception applies: (1) the proposed factual basis must strike a prudent person as constituting a reasonable basis to suspect the perpetration or attempted perpetration of a . . . fraud, and that the communications were in furtherance thereof; (2) after that showing is made, the Court has discretion whether to review the subject document *in camera*, and if it does, then the Court must in its discretion, determine whether the exception applies.

*In re Currency Conversion Fee*, No. MDL 1409, M 21-95, 2003 WL 22389169, at *6 (S.D.N.Y. Oct. 21, 2003) (internal quotation marks omitted). Ultimately, the moving party must make a sufficient showing that the privileged communication is reasonably related to and in furtherance

of fraudulent conduct.[11]

It is not necessary to show that the attorney from whom the client received advice was a knowing participant in the fraudulent conduct or was otherwise culpable.  *See In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1984) (attorney-client "communications are properly excluded from the scope of the privilege even if the attorney is unaware that his advice is sought in furtherance of . . . an improper purpose.").

> [W]here a client consults with an attorney for some illegal purpose from the beginning of the relationship, there is no need for an exception to normal privilege rules because the communications between lawyer and client strictly undertaken for an illegal purpose were never privileged in the first place.  If, on the other hand, the attorney-client relationship is immaculate at its conception, but then devolves into attorney assistance in illegal activity, then all of the communications between the client and the attorney are potentially privileged except those that are germane to some criminal or fraudulent goal.

*Chevron Corp. v. Snaider*, No. 14-cv-01354-RBJ-KMT, ___ F.Supp. 3d___, 2015 WL 226110, at *6 (D. Colo. Jan. 15, 2015) (citing *White v. American Airlines,* 915 F.2d 1414, 1423 (10th Cir. 1990)).

The Tenth Circuit has not articulated the precise requirements for establishing a prima facie showing; however, the party opposing the privilege must present evidence that the allegation of attorney participation in the fraudulent conduct has some foundation in fact.  *See In re Grand Jury Subpoenas*, 144 F.3d at 660; *see also In re Grand Jury Proceedings (Vargas)*, 723

---

[11]It is important to acknowledge the very limited scope of this court's analysis.  It is not the purpose or intent of this Order to pass judgment on the ultimate merits of Defendants' counterclaims or to cast aspersions on the actions of any attorney involved in the events underlying the action.  To the contrary, I am only required to decide whether Defendants have come forward with sufficient evidence to satisfy the narrower "prima facie" standard.  *See, e.g., In re Piercen's Estate*, 195 P.2d 725, 726 (Colo. 1948) ("prima facie evidence means evidence which is sufficient to establish the fact, unless rebutted – evidence which, standing alone and unexplained, would maintain the proposition and warrant the conclusion to support which it is introduced").  *Cf. Monday v. Robert J. Anderson, P.C.*, 77 P.3d 855, 856-57 (Colo. App. 2003) (noting that to establish a prima facie case, "the plaintiff must present evidence regarding each essential allegation of the complaint to demonstrate that there is some factual basis for relief before the defendant will be required to present evidence").

F.2d at 1467.  Other circuits require a similar showing.[12]  The movant may satisfy their burden

by presenting documentary evidence or testimony that is already in the record.  *See In re Grand*

*Jury Proceedings (Vargas)*, 723 F.2d at 1467.  When a movant has presented competent

evidence, the party seeking to rely onthe privilege or work product protection must come

forward with rebuttal evidence.  *See United States v. Davis*, 1 F.3d 606, 609 (7th Cir. 1993)

(holding that a party has established a prima facie case under the fraud exception "whenever it

presents evidence sufficient 'to require the adverse party, the one with superior access to the

evidence and in the best position to explain things, to come forward with that explanation'").  A

determination of whether the movant has satisfied their burden lies in the discretion of the court.

*In re September 1975 Grand Jury Term*, 532 F.2d 734, 737 (10th Cir. 1976).

　　　　In this case, Defendants' invocation of the fraud exception is intertwined with their claim

for fraud, which asserts that Plaza, its agents and its attorneys "fraudulently induced Defendants

into believing that their request for UIM benefits would be honored" and "fraudulently induced

Defendants to take steps that Plaza could later attempt to use to its benefit in refusing to pay the

UIM benefits to which Defendant have been and are entitled."

　　　　To prevail on a claim for fraudulent concealment or non-disclosure, Defendants must

prove: (1) concealment of a material fact that in equity and good conscience should have been

disclosed; (2) knowledge on the part of Plaza that such a fact was being concealed; (3) ignorance

---

[12]*See, e.g., United States v. Martin*, 278 F.3d 988, 1001 (9th Cir. 2002) ("reasonable cause to believe that the attorney's services were utilized in furtherance of the ongoing unlawful scheme."); *In re Sealed Case*, 107 F.3d 46, 50 (D.C. Cir. 1997) (evidence that if believed by the trier of fact would establish the elements of an ongoing or imminent fraud); *In re Grand Jury Proceedings (Appeal of Corporation)*, 87 F.3d 377, 381 (9th Cir. 1996) (invocation of fraud exception required reasonable cause to believe attorney was used in furtherance of ongoing scheme); *In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1242 (5th Cir. 1982) (evidence such as will suffice until contradicted and overcome by other evidence).

of that fact on the part of the Defendants; (4) Plaza's intention that the concealment be acted

upon; and (5) action on the concealment that resulted in damages. *Just in Case Bus. Lighthouse,*

*LLC v. Murray,* __ P.3d __, 2013 WL 3778184, at *11 (Colo. App. July 18, 2013) (citing *Nielson*

*v. Scott*, 53 P.3d 777, 779 (Colo. App. 2002). *See also Mallon Oil Co. v. Bowen/Edwards*

*Assocs., Inc.,* 965 P.2d 105, 111 (Colo. 1998) ("To succeed on a claim for fraudulent

concealment or non-disclosure, a plaintiff must show that the defendant had a duty to disclose

material information.  A defendant has a duty to disclose to a plaintiff with whom he or she deals

material facts that 'in equity or good conscience' should be disclosed.") (internal citation

omitted); *Briggs v. Am. Nat'l Prop. and Cas. Co.*, 209 P.3d 1181, 1186 (Colo. App. 2009)

(holding that "[u]ndisclosed facts are 'material' if the consumer's decision might have been

different had the truth been disclosed").

   For purposes of the instant motion, this court limited its initial review to those documents

or materials contained in the publically available record or attached to the parties' briefs.  *See*

*Zolin*, 491 U.S. at 574 ("the party opposing the privilege may use any nonprivileged evidence in

support of its request for *in camera* review, even if its evidence is not 'independent' of the

contested communications").  Those nonprivileged materials reveal the following facts,

communications and events.

   As noted previously, Martin Braden was struck by a vehicle driven by Dana Beales and

died on August 24, 2013.  Mr. Beales subsequently was charged with vehicular homicide-

reckless driving (a class four felony), third degree assault on a first responder (a class one

misdemeanor), two counts of reckless endangerment (class three misdemeanors), and reckless

driving (a class two traffic offense).[13]

On September 20, 2013, James and Bonnie Braden commenced a wrongful death action (case number 2013CV30769) against Dana Beales in Weld County District Court.[14]  The Bradens successfully moved on November 8, 2013 to place their wrongful death action in abeyance for 90 days, in part because their "counsel has been approached and contacted by an attorney, John Stehlik, who represents the interests of an individual who has an interest in this action."  On February 14, 2014, the state court entered an order noting that since the wrongful death action had been stayed on November 12, 2013, "nothing has been filed with the Court."  The Bradens' counsel was required to "file a status report" within 35 days and was warned that if his clients did "not timely respond to this Order, the Court may dismiss the Complaint without further notice without prejudice."  The Weld County District Court followed up with another Order on March 26, 2014, advising that the Bradens had until April 2, 2014 to file a "complete response, or a motion to dismiss" their wrongful death action.

Even as the wrongful death action remained inactive in Weld County District Court, Plaza, NARS, and their outside counsel anticipated an eventual UIM claim under the C&J policy.  On September 20, 2013, less than a month after Martin Braden's death, Sara McCloskey, an employee of Plaza's third party claims administrator, noted that "Martin [Braden's] estate's attorney is seeking UIM coverage under [C&J's] policy because the responsible party [Dana

---

[13]The vehicular homicide charge against Mr. Beales carried particular significance under Colorado's Wrongful Death Act, which provides that the cap on non-economic damages is inapplicable where "the wrongful act, neglect, or default causing death constitutes a felonious killing, as defined in § 15-11-803(1)(b), C.R.S., and as determined in the manner described in § 15-11-803(7)."  *See* C.R.S. § 13-21-203(1)(a).

[14]*See Jenkins v. State of Kansas*, 66 F.3d 338, at *2 (10th Cir. 1995) (noting that the court can take judicial notice of the records of official state court proceedings).

Beales] may not have enough coverage."  In the same note, Ms. McCloskey wrote that a C&J

representative had indicated that "Martin [Braden's] wife had an attorney, but his mother has

also gotten an attorney as well."  *See* Exhibit 1 (doc. #29-1), attached to Plaintiff's Response in

Opposition.  On October 18, 2013, Ms. McCloskey noted in her file that John Astuno had

recently filed a wrongful death claim on behalf of Martin Braden's parents and "is looking for

UIM benefits under C&J's policy."  *Id.*  At the same time, Ms. McCloskey alluded to possible

"conflicts between Braden's parents and his 'wife.'"  Although the Bradens' wrongful death

complaint stated that Martin Braden was not married at the time of the accident, Ms. McCloskey

was aware that C&J's workers compensation carrier "has determined that Braden had a common

law wife[15] and has reserved almost $500K in survivor benefits for her."  *Id.*  On October 31,

2013, Ms. McCloskey received a letter from Ms. Lester's attorney.  Mr. Stehlik advised Ms.

McCloskey that he had scheduled a meeting the Bradens' attorney, John Astuno, and had agreed

not to file a motion to intervene in the wrongful death action "pending the outcome of that

meeting."  According to Mr. Stehlik, Ms. Lester and the Bradens "hope to reach some sort of

agreement regarding the issue of Lester's common law status."  *Id.*

In a Claim Summary Report prepared on October 31, 2013, Ms. Mcloskey wrote that

"Braden's parents have filed a wrongful death lawsuit.  The attorney for Braden's girlfriend or

common law wife is planning to do the same or file a motion to intervene in the existing lawsuit

so that all parties are beneficiaries under the same claim."  Ms. McCloskey's "action plan" as of

---

[15]*See People v. Lucero*, 747 P.2d 660, 663 and 665 (Colo. 1987) (noting that a common law marriage in Colorado is "established by the mutual consent or agreement of the parties to be husband and wife, followed by a mutual and open assumption of a marital relationship," and that in the absence of an express agreement, "any form of evidence that openly manifests the intention of the parties that their relationship is that of husband and wife will provide the requisite proof from which the existence of their mutual understanding can be inferred").

October 31, 2013 included "conduct[ing] initial discovery to clarify marital status of Braden at the time of his death."  *See* Exhibit 2 (doc. #36-2) attached to the Reply in Support of Defendants' Motion to Compel.

The foregoing records make clear that by October 31, 2013, Plaza's third party claim administrator was on notice that a UIM claim would be forthcoming, that a wrongful death action had been filed by James and Bonnie Braden, that there was some reason to believe Martin Braden had a common-law wife who would be a putative plaintiff under Colorado's Wrongful Death Act, and that Ms. Lester would not be intervening in the wrongful death action in advance of discussions with the Bradens.  Also by October 31, 2013, Plaza was being represented in this matter by the Treece Firm.[16]

On January 31, 2014, John Astuno wrote to Katherine Jensen (and copied Mr. Stehlik), advising that he anticipated receiving an offer from Mr. Beales' insurance carrier "to settle for the policy limits ($100,000)."  In the same letter, Astuno noted that his clients "want to preserve and protect the UIM claim" and for that reason wished to know if Plaza would "consent" to accept the policy limits from Beales' insurance carrier.  *See* Exhibit 3 (doc. #26-3) attached to the Declaration of John Astuno.  Less than three weeks later, on February 17, 2014, Ms. McCloskey noted in a Claim Summary Report that "[Martin] Braden's parents and common law wife will jointly pursue the wrongful death and UIM claim with each taking a share."  The "action plan" included in this Report raised the possibility of "consider[ing] mediation to resolve

---

[16]*See Jehly v. Brown,* 327 P.3d 351, 354-55 (Colo. App. 2014) (acknowledging the agency law principle that "knowledge of an agent generally is imputed to the principal" and citing Restatement (Second) of Agency § 275 for the proposition that "except where the agent is acting adversely to the principal or where knowledge as distinguished from reason to know is important, the principal is affected by the knowledge which an agent has a duty to disclose to the principal or to another agent of the principal to the same extent as if the principal had the information").

[the] UIM claim."  *See* Exhibit 4 (doc. #36-4) attached to the Reply in Support of Defendants'

Motion to Compel.  By February 21, 2014, Ms. Jensen and her firm were on notice that the

Bradens and Ms. Lester had "agreed to settle jointly any and all claims arising from this accident

for Mr. Beales' liability insurance policy limits."  *See* Exhibit 4 (doc. #26-4) attached to

Declaration of John Astuno.  On that same day, Astuno asked Ms. Jensen whether Plaza was

"now in a position to give us consent to settle with the tortfeasor's carrier."  *Id.*

On February 26, 2014, Astuno sent McCloskey a claim for "the full available UIM

coverage, i.e., $1,000,000, that will be necessary to settle this wrongful death claim."  After

analyzing in depth the felonious killing exception to the Wrongful Death Act, the implications of

a guilty verdict on coverage under the UIM policy, and the economic losses arising from Martin

Braden's death (which he estimated at $713,000.00), Astuno suggested that Plaza's exposure

could well exceed $1,149,070,00.[17]  Astuno concluded his letter to Ms. McCloskey by stating

that  his clients "look forward to resolving this matter with you as soon as you obtain the full

policy limit authority that will be necessary to conclude this matter."  *See* Exhibit 2 (doc. #26-2)

attached to the Declaration of John Astuno.

On March 7, 2014, Ms. Jensen advised Mr. Astuno that Plaza would approve the

settlement with Dana Beales' insurance carrier.  *See* Exhibit 1 (doc. #9-1) attached to

Defendants' Answer and Counterclaim.  Mr. Astuno also claims that the Treece Firm knew as of

March 7, 2014 that Ms. Lester had not been joined as a named party in the wrongful death

---

[17]*Cf. Estate of Wright v. United Servs. Auto. Ass'n*, 53 P.3d 683, 686 (Colo. App. 2002) (after noting that plaintiff's claim "involve[d] the contractual liability of an insurer rather than the tort liability of the person who caused the death," the court acknowledged that "[b]ecause plaintiffs would be legally entitled to recover uncapped noneconomic damages from the driver who caused decedent's death or from the driver's liability insurer, they [were] entitled to recover the amount of such damages from USAA, subject to policy limits").

action.  According to Astuno, while the original plan had been to substitute Ms. Lester for the Bradens as the named plaintiff in the Weld County case, the settlement with Mr. Beales' insurance carrier "negated any reason for Carolyn Lester to be joined as a plaintiff."  Indeed, Astuno believed that once Beale's policy limits were tendered, "there was no need to do anything in the wrongful death action except seek Plaza's approval of the settlement offer and receive the funds."  *See* Second Declaration of John Astuno (doc. #34), at ¶ 6.

Less than a week after authorizing the Bradens and Ms. Lester to accept the settlement offered by Beales' insurance carrier, Ms. McCloskey prepared a Large Loss Report that analyzed the putative claims by Ms. Lester and the Bradens, the current status and potential impact of the wrongful death action on a future UIM claim, and Plaza's potential exposure under the UIM policy.  *See* Exhibit 5 (doc. #36-5) attached to the Reply in Support of Defendants' Motion to Compel.  Sara McCloskey's March 13 Report noted that "Colorado recognizes common law marriage in the wrongful death context.  In Colorado, two people are common law married if: 1) they do not have a marriage license, but 2) they consider themselves to be married to each other and 3) they hold themselves out to the community as married individuals."  She also was aware that C&J's workers compensation carrier, Pinnacol Assurance, had agreed to pay Ms. Lester a portion of Mr. Braden's "average weekly wage for the rest of her life or until she remarries," apparently based on her common law marriage to Mr. Braden.

Ms. McCloskey acknowledged that Ms. Lester's attorney "has advised that he will be filing a lawsuit or motion to intervene in the wrongful death suit filed by Braden's parents so that all parties are beneficiaries to the same claim."  But the Large Loss Report also noted that Carolyn Lester and the Bradens "have reached an agreement as to the apportionment of

settlement proceeds in this case" and that the Bradens had not yet served the complaint in their

wrongful death lawsuit.  Ms. McCloskey opined that "Astuno has not yet amended the wrongful

death Complaint to include Lester as a plaintiff as it may not be legally proper to do so."[18]

The Large Loss Report then analyzed the Wrongful Death Act and its possible

implications for a future UIM claim.

> Under Colorado's wrongful death act, only the heirs of the deceased, spouse of
> the deceased, parents of the deceased or one who qualifies as the deceased's
> "designated beneficiary" may bring suit on behalf of the deceased's estate. Only
> one action may be brought for the death of an individual. If the deceased is
> married and/or has children at the time of his death, the surviving spouse and the
> heirs of the deceased have an equal right to bring suit, either separately or jointly.
> If the heirs file suit first, the spouse may intervene within 90 days after service of
> written notice of suit. If the spouse does not join, the heirs cannot sue for
> pecuniary losses incurred by the spouse.
>
> Parents may bring suit only if the deceased had no surviving spouse AND no
> heirs. Parents bringing suit together need not be married, and if they are both
> living, they generally share equally in the recovery. If the parents are divorced,
> each may file a motion to have the court make a post-judgment apportionment of
> the recovery based on the parent's relationship with the child. The heirs, if any,

---

[18]Presumably, Ms. McCloskey was relying upon the decision in *Espinoza v. Perez*, 165 P.3d 770, 773 (Colo. App. 2006), which held that a decedent's mother lacked standing to bring an action under Colorado's Wrongful Death Act because the decedent was survived by lineal descendants.  In the absence of standing, there was no basis for the court's exercise of jurisdiction over the mother's claim and the court held that jurisdictional defect could not be cured through the intervention of a new plaintiff with a legally cognizable claim. *Id.* at 774-75. However, the Large Loss Report fails to address the applicability of C.R.C.P. 41(a)(1), which allows a plaintiff to dismiss an action without order of court, and without prejudice, "at any time before filing or service by the adverse party of an answer or of a motion for summary judgment."  While amending the Bradens' complaint to join Ms. Lester might not have been possible, the Bradens could have achieved the same result by filing a notice of dismissal without prejudice under C.R.C.P. 41(a)(1)(A). *See Janssen v. Harris*, 321 F.3d 998, 1000 (10th Cir. 2003) ("The effect of the filing of a notice of dismissal pursuant to Rule 41(a)(1)(I) is to leave the parties as though no action had been brought."); *McCall-Bey v. Franzen*, 777 F.2d 1178, 1184 (7th Cir. 1985) (explaining that the general purpose of Rule 41(a) "is to preserve the plaintiff's right to take a voluntary nonsuit and start over so long as the defendant is not hurt"). *See also Alpha Spacecom, Inc. v. Hu*, 179 P.3d 62, 64 (Colo. App. 2007) (noting that because C.R.C.P. 41(a)(1)(A) is substantially similar to Fed. R. Civ. P. 41(a)(1)(I), "federal case law and authorities are persuasive in interpreting it").  That course of action would have left Ms. Lester free to bring a new wrongful death case within the two-year statute of limitations, *see* C.R.S. § 13-80-102(1)(d), without running afoul of the "one civil action" rule. *Cf. Barnhart v. Am. Furniture Warehouse Co.*, 338 P.3d 1027, 1030 (Colo. App. 2013) (noting that the "one civil action" provision in the Wrongful Death Act was intended to prevent "multiple recoveries" in successive lawsuits. Thus, as of March 13, 2014, Plaza still faced the very real possibility that Ms. Lester could pursue a wrongful death action even the most stringent application of the "one civil action" rule.

all share equally in the recovery.

* * *

Damages are the net pecuniary benefit that the plaintiff might reasonably have expected from the deceased, excluding consumption costs. Economic damages include future lost wages and medical and funeral costs. There is no limit on economic damages.[19]

* * *

There is no cap on noneconomic damages if the death is a result of a felonious killing. . . . An actual criminal conviction is not necessary as the court in the wrongful death action will make an independent determination as to whether the conduct of the defendant was sufficiently egregious to constitute murder or manslaughter.

After discussing the particular circumstances of James and Bonnie Braden, McCloskey concluded that "the value of [the wrongful death filed by the Bradens] would appear to be that of a non-economic pain and suffering case," but that a jury would likely "find that Braden's death was the result of a 'felonious killing' so the non-economic damages would not be capped." *Id*. The Large Loss Report estimated the losses or damages resulting from Martin Braden's death at more than $743,000; an amount substantially in excess of the limits under Mr. Beale's insurance policy.[20]  Ms. McCloskey concluded her Report by recommending authority to settle the UIM claim.

Thus, it appears that as of March 13, 2014, Plaza, through its third party claim administrator, understood that Ms. Lester and the Bradens had agreed to settle the wrongful

---

[19]Ms. McCloskey placed the present value of Ms. Lester's putative economic damage claim at "$515,647, less 50% for consumption = $257,823."

[20]Mr. Astuno estimated the economic losses arising from Mr. Braden's death to be in excess of $700,000 and "understood that $100,000 could not possibly make the Bradens and/or Ms. Lester whole," which would make a UIM claim necessary.  *See* Declaration of John Astuno (doc. #26), at ¶ 11.

death action that remained pending in Weld County and that Ms. Lester intended to formally join

the action in Weld County, but had not yet done so.  Plaza also was aware that a UIM claim had

been submitted on February 26, that the Bradens and/or Ms. Lester intended to pursue that claim

after resolution of the wrongful death action, that the wrongful death action involved conduct

that might fall outside the statutory cap for non-economic damages, and that Plaza's potential

exposure to economic damages was substantially greater if the UIM claim was brought by Ms.

Lester, rather than the Bradens.

On March 17, 2014, Ms. Jensen wrote to Astuno to address "the Wrongful Death Claim

of Martin Braden and the intended Uninsured/Underinsured Motorist ("UIM") claim you intend

to pursue on behalf of Mr. Braden's parents against his insurance carrier, Plaza Insurance

Company."  *See* Exhibit 5 (doc. #26-5) attached to the Declaration of John Astuno.  Ms. Jensen

asked to "confirm some facts and . . . flesh out the details of the UIM demand so that we may

properly analyze this claim in an attempt to resolve it amicably prior to the filing of a lawsuit."

As for the still-pending wrongful death action, Ms. Jensen understood that "Mr. and Mrs. Braden

will continue to prosecute [that action] without Ms. Lester's intervention" and also "assume[d]

that Bonnie Braden and James Braden will be the plaintiffs in any action brought against Plaza

as well."  Without even acknowledging Ms. Lester's potential claim for economic damages,

counsel observed that

> [Martin] Braden was not contributing financially to Bonnie Braden or James
> Braden's household, and that they did not receive any benefit from (or expect to
> receive a benefit from) his wages.  We are therefore confused as to how Mr. and
> Mrs. Braden have an economic damages claim.  If you still intend to claim
> economic damages on behalf of Mr. and Mrs. Braden, please let me know the
> basis for the claim so that I can better analyze this portion of the claim.

Ms. Jensen did not copy Ms. Lester's original counsel on this letter, even though Sara

26

McCloskey's Large Loss Report had noted Stehlik's stated intent to "fil[e] a lawsuit or motion to intervene in the wrongful death suit."

John Astuno promptly responded to Ms. Jensen's letter on March 18, 2014. In his response, Astuno stated that Ms. Lester's status as Martin Braden's common law wife was "no longer an issue" for James and Bonnie Braden. Astuno also told Ms. Jensen that the Bradens were not planning to pursue the UIM action, because it was "Ms. Lester's claim" and "[s]he is the common law wife of the deceased." Indeed, John Astuno asserted that Ms. Jensen's "letter completely misstate[d] what we told you." *See* Exhibit 2 (doc. 9-2) attached to Defendants' Answer and Counterclaim.

On March 19, 2014, Ms. Jensen again wrote to John Astuno, ostensibly to confirm her understanding that the Bradens and Ms. Lester had "resolved any outstanding issues between them that are relevant to this case at that time,"[21] and that John Astuno was acting as co-counsel for Ms. Lester.[22] *See* Exhibit 6 (doc. #26-6) attached to the Declaration of John Astuno. Ms. Jensen also acknowledged "that Ms. Lester will be the named plaintiff for the purpose of any wrongful death claim brought against Martin Braden's UIM carrier." Ms. Jensen's letter did not ask for any information regarding Ms. Lester's putative damages or refer, either directly or indirectly, to the status of the wrongful death action or a possible invocation of the "one civil

---

[21]Curiously, Ms. Jensen also said that she could not recall "being informed of the results of mediation" between the Bradens and Ms. Lester. However, Sara McCloskey apparently was aware of those "results" as her Large Loss Report noted that the Bradens and Lester had "reached an agreement as to the apportionment of settlement proceeds in this case."

[22]Once again, Mr. Stehlik was not copied on correspondence that directly related to his client and a future UIM claim that she clearly intended to assert.

action" rule.[23]   She simply closed by stating that Plaza expected "to respond to your settlement

demand of February 26, 2014 shortly."   *Id.*

On April 1, 2014, Mr. Astuno forwarded for Ms Jensen's review the proposed Settlement

Agreement negotiated in the wrongful death action.   Mr. Astuno explained that he wanted Ms.

Jensen's "blessing . . . well to the proposed Settlement Agreement and asked for "the benefit of

[her] thoughts on the matter."   *See* Exhibit 4 (doc. #9-4) attached to Defendants' Answer and

Counterclaim.   However, Mr. Astuno believe that he was "duty-bound to dismiss the wrongful

death case with prejudice" if the settlement was acceptable to Plaza and once the settlement

funds were received from Beale's insurance company.   *See* Declaration of John Astuno (doc.

#26), at ¶¶ 20-21, and Second Declaration of John Astuno (doc. #34) at ¶¶ 12 and 13.   Ms.

Jensen responded with Plaza's and NARS' approval of the form and substance of the proposed

Settlement Agreement.

Thirty-seven days after John Astuno submitted a claim for "the full available UIM

coverage," Katherine Jensen again wrote to Astuno (without copying Stehlik).   In her letter of

April 4, 2014, Ms. Jensen stated that Plaza was continuing to analyze the UIM claim and

Astuno's demand letter of February 26, 2014 and that she "would appreciate any clarification

you can provide so that we can better assist our clients in an attempt to amicably resolve this

claim."   *See* Exhibit 7 (doc. #26-7) attached to the Declaration of John Astuno.   According to

---

[23]On March 27, 2014, Mr. Astuno  advised the Weld County District Court that "[t]he litigation against Defendant Beales should be resolved within the next several days" and a Notice of Dismissal would be filed "as soon as the documents are received - which should take place no later than the end of next week."  As of that same date,  it was still possible for the Bradens to voluntarily dismiss their wrongful death action pursuant to C.R.C.P. 41(a)(1)(A) and for Ms. Lester to commence a new action against Mr. Beales, assuming they were aware of Plaza's interpretation of the "one civil action" rule and intent to invoke that rule as a bar to any future UIM claim.  The Bradens and Ms. Lester did not execute a Settlement Agreement and Release of All Claims against Mr. Beales until April 3, 2014. *See* Exhibit 7 (doc. #29-1) attached to Plaza's Response in Opposition.

Ms. Jensen, it was still "unclear as to whether or not you [Astuno] represent Ms. Lester along

with Mr. and Mrs. Braden."[24]  Plaza's outside counsel suggested that a better understanding of

who Astuno "specifically represent[s] in this matter" would "help us facilitate our settlement

discussions and the preparation of any release in this matter."  Ms. Jensen interpreted Mr.

Astuno's letter of March 18, 2014 as suggesting that "Ms. Lester has standing to bring the claim

and that Mr. and Mrs. Braden will not prosecute the wrongful death claim."  She then wrote:

> However, it appears that Mr. and Mrs. Braden are the only named plaintiffs in the wrongful death case against Mr. Beales (2013CV030769).  As a result, I am unclear as to who, exactly, will be prosecuting this claim in the event we are unable to reach an agreeable settlement given that the Bradens are still the named plaintiffs [in the wrongful death action].  We are having a difficult time working through these standing issues based on the complaint that was filed by the Bradens and the applicable sections of Colorado's Wrongful Death statute.  Any clarification you can provide would be greatly appreciated.

*Id.*

In the same letter, Ms. Jensen asks for "any evidence you may have that supports Ms.

Lester's claim that she is Mr. Braden's common law wife" as well as "some evidence of Ms.

Lester's net pecuniary loss" so that the Treece Firm can "better analyze the claim and facilitate

settlement discussions with our client."  However, Ms. Jensen assured John Astuno that Plaza "is

prepared to enter discussions of settlement when the issues are clarified."

Ms. Jensen's April 4, 2014 letter is striking, particularly in light of the Complaint for

Declaratory Relief that Plaza filed 20 days later and the arguments advanced in its recently

denied motion for summary judgment.  Although Ms. Jensen alluded to "standing issues"

implicated by the wrongful death complaint filed by the Bradens and "the applicable sections of

---

[24]This "confusion" would have been avoided if Mr. Stehlik had received courtesy copies of earlier correspondence.

Colorado's Wrongful Death statute,"[25] a fair reading of this letter would not have put Mr. Astuno

on notice of Plaza's interpretation of the "one civil action" provision or Plaintiff's intent to assert

that provision in the context of a future UIM claim brought by Ms. Lester.  Plaza's invocation of

the "one civil action" rule as a bar to Ms. Lester's UIM claim necessarily hinged on the

settlement and dismissal of the wrongful death action with prejudice.  Ms. Jensen's letters also

suggested that Plaza was still "unclear as to who, exactly, will be prosecuting this claim in the

event we are unable to reach an agreeable settlement."  Yet, as a practical matter, none of the

information that Ms. Jensen claimed was necessary to pursue settlement of the UIM claim had

any practical significance given Plaza's "one civil action" strategy, the April 3rd settlement with

Beales, and the Weld County District Court's order of March 26, 2014.  Having approved the

settlement with Beales' insurance carrier, Plaza's "one civil action" strategy sought to exploit

that settlement and thereby place Astuno and his clients in an untenable position.

On April 10, 2014, Ms. Jensen again wrote to Astuno (and for the first time copied John

Stehlik) acknowledging receipt of documents regarding Ms. Lester's status as Martin Braden's

common law wife, but asking for available "documentation concerning probate proceedings or

other judicial determination concerning Ms. Lester's status."  She again requested

documentation supporting a calculation of Ms. Lester's net pecuniary loss and closed her letter

by stating that "[o]nce I receive those supporting documents, I will forward them to my client

immediately for their consideration in resolving this claim."  *See* Exhibit 8 (doc. #26-8) attached

to the Declaration of John Astuno.  On that same day, John Astuno filed a Notice of Dismissal in

the wrongful death action. *See* Exhibit 10 (doc. #26-10) attached to the Declaration of John

---

[25]Those sections of the Wrongful Death Act that address "standing" are found at C.R.S. § 13-21-201(1)(a) and (b). The reference to "only one civil action" is found at C.R.S. §13-21-203(1)(a).

Astuno.

Two weeks later, Mark Harris of the Treece Firm provided Mssrs. Astuno and Stehlik with a "courtesy copy" of the Complaint for Declaratory Relief filed by Plaza that same day in the United States District Court.  According to Mr. Harris, Plaza initiated its declaratory judgment action in an effort to obtain the "Court's assistance" after outside counsel had worked "diligently" to "find any case law or statutory authority that allows one claimant (the parents) in a wrongful death action to bring a case against an alleged tortfeasor and a different claimant (the alleged common law wife) to bring another wrongful death action against the UIM carrier." *See* Exhibit 9 (doc. #26-9) attached to the Declaration of John Astuno.  Mr. Harris' letter does not indicate "when," in the course of extended communications with Mr. Astuno, Plaza and its outside counsel first identified this potential statutory problem.  The letter also conspicuously fails to explain why the "one civil action" rule was raised for the first time with counsel for the Bradens and Ms. Lester only after the wrongful death action was dismissed with prejudice and after the declaratory judgment action was filed.

In summary, the court's review of available non-privileged or non-protected information establishes the following facts.  By April 1, 2014 (before the settlement agreement in the wrongful death action was signed and before that case was dismissed with prejudice), Plaza and its agents (including Ms. McCloskey and outside counsel) were aware that (1) Mr. Astuno had made a formal claim on behalf of the Bradens and Ms. Lester for UIM benefits under the policy that insured the deceased, Martin Braden; (2) that Ms. Lester was receiving workers compensation benefits in her capacity as Mr. Braden's common law wife; (3) that the Bradens were not contesting Ms. Lester's status as their son's common law wife; (3) that the wrongful

death action against Mr. Beale was still pending in Weld County District Court and that Ms.

Lester was not yet precluded from seeking relief under Colorado's Wrongful Death Act; (5) that

the $100,000 available from Beale's insurance carrier would not cover all losses resulting from

Martin Braden's death;[26] and (6) that Plaza's financial exposure might be substantially lessened

if a future UIM claim was limited to the Bradens' right to recover non-economic damages.

      Colorado law recognizes that "the vendor of an insurance policy has a legal duty to deal

fairly and in good faith with its insured." *Bucholtz v. Safeco Ins. Co. of Am.,* 773 P.2d 590, 592

(Colo. App. 1989) (citing *Farmers Grp., Inc. v. Trimble*, 691 P.2d 1138 (Colo. 1984)).  *Cf.*

*Kisselman v. Am. Family Mut. Ins. Co.*, 292 P.3d 964, 970 (Colo. App. 2011) ("An insurer must

deal in good faith with its insured.").  As the court noted in *Berwick v. Hartford Fire Ins. Co.,*

*Inc.*, No. 11-cv-01384-MEH-KMT, 2012 WL 4097306, at *2 (D. Colo. Sept. 18, 2012), "[a]n

insurance company is not merely required to avoid acting in bad faith toward its insured.  Rather,

'in a first-party action, the defendant insurance company owes the plaintiff-insured a duty of

good faith.'" *Id.* (quoting *Sunahara v. State Farm Mut. Auto. Ins. Co.*, 280 P.3d 649, 657 (Colo.

2012)). *See also In re Parker Excavating, Inc.*, No. 08-19552 MER, 2013 WL 6076459, at *2

(Bkrtcy. D. Colo. Nov. 19, 2013) ( "The insurance contract imposes a 'quasi-fiduciary'

relationship between the insurer and insured that imposes an implied covenant of good faith

upon the insurer.").

      As one court has explained, the implied covenant of good faith and fair dealing

incorporated in an insurance contract contemplates that the insured and insurer are

---

[26]*See Sunahara v. State Farm Mutual Automobile Insurance Co.*, 280 P.3d 649, 657 (Colo. 2012) ("UIM coverage is designed to put a driver who is injured by an underinsured motorist in the same position as if the underinsured motorist had liability limits in amounts equal to the insured's coverage.") .

> bound to refrain from any action which would impair the benefits which the other
> had the right to expect from the contract or contractual relationship. . . . Thus, the
> insurance contract and the relationship it creates contain more than the company's
> bare promise to pay certain claims when forced to do so; implicit in the contract
> and the relationship is the insurer's obligation to play fairly with its insured.

*Rawlings v. Apodaca*, 726 P.2d 565, 570 (Ariz. 1986) (cited in *Abdelsamed v. New York Life Ins.*

*Co.*, 857 P.2d 421, 430 (Colo. App. 1992)).  As a "necessary corollary" of the insurer's implied

covenant of good faith and fair dealing, an insurer presumably "will not do anything that hinders

or prevents the insured from obtaining benefits under the insurance policy." *Cf. Santos v.*

*Farmers Ins. Exch.*, No. 07-11229, 2008 WL 506351, at *6 (E.D. Mich. Feb. 22, 2008).

> An insurer has the right to protect its interests in investigating an insured's claim
> to policy benefits, and when these interests run parallel to each other, neither is
> superior.  Where, however, an insurer's and an insured's interests conflict, the
> insurer cannot protect its own interests to the detriment of the insured's interests,
> but must sacrifice its interests in favor of those of the insured.

*Sav-O-Mat, Inc. v. Nat'l Farmers Union Prop. and Cas. Co.*, No. 00 CV 8556, 2005 WL

2972978, at *15 (Colo. Dist. Ct., Aug. 25, 2005) (internal citations omitted).  *But see Sunahara*

*v. State Farm Mutual Automobile Insurance Co.*, 280 P.3d at 657 (noting that in the context of a

first-party action for UIM coverage, "[t]he defendant insurance company will naturally attempt

to minimize the plaintiff's damages . . . because doing so serves the company's financial

interests").

Based upon my review of the publically available record, I believe there is sufficient

evidence to support a good faith belief by a reasonable person that Plaza fraudulently

misrepresented or concealed material information from Defendants in an effort to bar, or

substantially constrain, any recovery of UIM benefits by Ms. Lester and/or the Bradens, and that

Plaza's communications with NARS and the Treece Firm were related to and in furtherance of

that fraudulent conduct.  My independent review of the materials presented leads to the

conclusion that Plaza and its counsel knowingly withheld information that was critical to the

Bradens' and Ms. Lester's decision-making on how best to preserve a future UIM claim that

everyone agreed was meritorious.  I further find that Plaza and its counsel made misleading

representations in order to bolster Plaintiff's position in any future UIM case, to the detriment of

whomever brought the UIM claim.  In short, the fraud exception requires that some, but not all,

privileged and work product documents must be disclosed to the Defendants.

Accordingly, I will require Plaintiff to produce the following documents listed on its

Revised Privilege Log:  PIC0377-0378, PIC0386-0387, PIC0388, PIC0409, PIC0412-0414,

PIC0416, PIC0420-0421, PIC0421, PIC0422-424, PIC0427-0428, PIC0458-0459, PIC0465,

PIC0470 [Claim Note dated 3/7/14], PIC0472 [e-mail on 3/3/14], PIC0473-0475 [Claim Notes

dated 3/20/14, 3/27/14/, 4/17/14, 4/22/14 and 4/9/14], PIC0526-0527, PIC0530-0531, PIC0613-

0614, PIC0615-0616, PIC0619-0620, PIC0634-0625, PIC0626-0629, and PIC0638-0639.  In

addition, Plaza must produce the following documents listed on its First Supplemental Privilege

Log:  TAM586, TAM588-589, TAM590-591, TAM590-591, TAM655, TAM667, TAM676-

678, TAM681-682, TAM698-699, TAM700-701, TAM702, TAM703, TAM704-708, TAM711,

TAM715, TAM721, TAM742-748, TAM749-750, TAM750-762, TAM763, TAM779,

TAM780-781, TAM819, TAM826-827, TAM828, TAM829, TAM831, TAM833, TAM835,

TAM837, TAM841, TAM843, TAM847, TAM852-854, TAM857-858, TAM859, TAM863,

TAM865-868, TAM871-872, TAM875-876, TAM886, and TAM891.  I will stay production of

the aforementioned documents for a period of fourteen days, or until June 18, 2015, to allow

Plaza to consider whether to file an objection under Fed. R. Civ. P. 72(a).  In the event an

objection is filed, the stay of production will remain in effect pending a ruling by the district court.

DATED this 4th day of June, 2015.

BY THE COURT:

<u>s/ Craig B. Shaffer</u>
Craig B. Shaffer
United States Magistrate Judge